[Civ. No. 15091.   First Dist., Div. One.   June 4, 1952.]

JOHN A. KEPPELMAN, Respondent, v. JOHN D. HEIKES et al., Defendants; SALINAS NEWSPAPERS, INC., Appellant.

476

Lacey & Thornberry for Appellant.

Foster & Redhead for Respondent.

BRAY, J.—In an action on three counts (1) for the reasonable value of work done and materials furnished, (2) an open book account, and (3) an account stated, plaintiff recovered judgment on the first two counts in the sum of

$1,302.18, against defendants Peden and Salinas Newspapers, Inc.* The last named defendant appeals.

## QUESTIONS PRESENTED

1. Sufficiency of evidence.
2. Alleged errors in admission and rejection of evidence.
3. Alleged abuse of discretion by court in refusing to reopen cause to take a deposition.
4. Book account.

### 1. SUFFICIENCY OF EVIDENCE

Taking the facts and the reasonable inferences therefrom most strongly in favor of plaintiff, as we are required to do, it appears that there is substantial evidence to support the findings and judgment. Plaintiff is a newspaper publisher and printer in Monterey. He printed about 6,000 copies of a business directory booklet entitled "KDON 1950-1951 Directory and Guide Book," and several other matters including stationery and mailing envelopes for the directory. The order was given by John D. Heikes and the main controversy is whether defendant either joined in the order or held out Heikes to plaintiff as its agent. Heikes was the general manager of James H. Peden Associates, the business name of defendant Martha E. Peden. She does not deny liability and has not appealed. Defendant owns radio stations KDON and KSNI and the Salinas "Californian," a newspaper. Gilbert Baymiller is the general manager of station KDON and the Californian. Peden has been engaged for several years in the business of promotion and advertising, and has published numerous similar business directories in California and elsewhere. She had an agreement with defendant by which she was to publish the directory at her own expense. She was to pay defendant $3.75 for each advertiser listed in the directory which charge included $3.50 for two radio announcements of the advertiser and 25 cents for setting each listing in type. Defendant had this type made by a third party. Peden charged each advertiser $15 per listing. The contract provided that all payments by advertisers were to go into a bank account called the KDON Special Directory Account. Funds from this account could be paid out only by checks signed by Baymiller.

Heikes came to plaintiff stating that he was representing

---

*Defendant Salinas Newspapers, Inc., will be referred to herein as defendant.

KDON and ordered the printing of the directory. About a month or six weeks later and before any work was started plaintiff called Baymiller on the phone. "I told him that it was a fairly large printing order for us to do; probably would involve, for us, quite a bit of money, and that I wanted to be sure that we didn't get stung on it, and he said that I would have nothing to . . . He simply told me that all of the funds—that I would have nothing to worry about in payment of the book because all of the funds which involved the book were being handled by him and were coming through his account, and before anything was paid out in the way of profit or remuneration to the parties doing it, that all the costs would be paid. I had had some unfortunate experiences before and I didn't want to get caught again." At the trial after giving the above testimony plaintiff was asked if Baymiller gave him any authorization to print the directory for KDON. He replied, "Strictly speaking, I don't think he did quite that way." Later, when asked by the court to repeat the conversation in more detail, plaintiff testified: "I said, 'A fellow by the name of Heikes has been coming in here to find out about the printing of a KDON Directory. You were manager of KDON. I don't know the guy. I don't know anything about him, and we have been stung previously on some accounts and I wanted to find out whether this was authorized, whether it is a genuine order and something about him,' and Gil said, 'Yes.' He said, 'It is perfectly genuine.' He said, 'Have you got the order?' I said, 'Well, to the best of my knowledge we have, but I don't want to order any paper or do any printing until I have some idea whether it is to be paid.' Well, Gil said, 'Kep, you don't have a thing to worry about on this.' He said, 'All the funds come into my hands,' and he said, 'I make out all the checks on it,' and he said, 'Nothing will be paid out to them at all until all the costs are paid.' I said, 'That is swell, Gil. I think that is wonderful. I just wanted to make sure that it is on the up and up and that somebody more responsible than this guy was going to see that I got paid' . . ." Plaintiff went to the Californian building where defendant and KDON are located and received the type for the directory from defendant's composing room. An advertisement was run in defendant's newspaper concerning "KDON-KSNI Compiled Directory for the County." This was with Baymiller's sanction and approval. A similar advertisement was run in other county papers, including plaintiff's. Plain-

tiff could not recall who ordered it run in his newspaper. (It probably was Heikes.) A small part of plaintiff's charge, and included in the judgment, is the cost of running this advertisement. Baymiller testified he did not know of the advertisements in any of the newspapers other than his own. However, as he signed the checks for the cost, it is a reasonable inference that he did. Defendant did authorize the use by Peden of the name KDON Directory. Baymiller's version of the phone conversation with plaintiff is drastically different from that of plaintiff. Baymiller denied that he told plaintiff that he would see that the costs were paid. He admitted, however, that he told plaintiff about the bank account and that he was going to issue checks and explained how the bank account was to be handled. He admitted telling plaintiff that he would have nothing to worry about on the account, but claimed it was in connection with explaining to plaintiff that Peden had an excellent reputation and was "A-1."

Plaintiff claimed that at no time in the conversation did Baymiller mention Peden. When the first 600 directories were printed Baymiller took some of them. Other directories were shipped to KDON, Salinas. All checks for subscribers to the directory were made to KDON Directory. A KDON Special Directory Account was set up by Heikes and Baymiller. Most of these checks were given to Heikes by the debtors and by him turned over for deposit to Baymiller's secretary handling the account. Some, however, were mailed directly to KDON. Baymiller testified that all disbursements from this account were made only on authorization of Heikes and signed by Baymiller. Some of the checks were made out by Heikes and some by Baymiller's secretary. Apparently on occasions she made out checks and was to get Heikes' authorization later. Among the checks signed by Baymiller were four to Heikes totaling $480 and three to Peden totaling $2,400. Defendant controlled KDON advertising and did not make known the fact either to plaintiff or through the advertisements run in the various newspapers concerning the KDON directory that Peden had anything to do with it. Defendant desired the directory to be known as the KDON Directory, and although other directories put out by Peden contained her name, no mention of Peden appears in this directory. Heikes had his headquarters in defendant's office and used its phones. Defendant know that the name KDON was to be used in soliciting ad-

vertising for the directory and that telephone solicitations were to be in the name of KDON. A Mrs. Dear in the name of KDON directory solicited plaintiff for an advertisement in the directory. Plaintiff received an invoice for this on a billhead containing defendant's name (one of those printed by plaintiff). From time to time as the work progressed plaintiff sent bills to KDON and received no objection to them. Baymiller denied he had ever seen them. The first bill of $550 was so sent and plaintiff received a check for that amount signed "KDON Special Directory Account [type-written], Gilbert V. Baymiller [in ink]." Plaintiff had performed services in the past for defendant and kept a ledger sheet showing charges and credits, the last entry upon which (prior to the matters involved here, which were also charged to that account) shows a balance of the account. On June 24, 1950, Peden and plaintiff signed a memorandum agreement, referred to in defendant's brief as "an accepted offer of compromise" in which plaintiff agreed to accept $1,629.32 as the price of the directory, subject to various adjustments specified and less the sum of $550 already paid on account. It provides that it "is a compromise settlement between the parties hereto" and that all directories are available to Heikes as of that date.

The conversation between plaintiff and Baymiller coupled with the other matters above set forth which occurred before and during the printing of the directory would cause any reasonable person to conclude that Heikes was the agent of defendant in the getting out of the KDON directory and that Baymiller had approved of the order given plaintiff by Heikes. It is true that in that conversation nothing was said in exact words that Heikes was KDON's agent, but such a conclusion is a reasonable one to be deduced from plaintiff's version, and it was plaintiff's version that the trial court believed. "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) The test is: "'before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, to-wit:' (quoting from *Hill* v. *Citizens Nat. Tr. & Sav. Bank,* 9 Cal.2d 172, 176 [69 P.2d 853]) '[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neg-

lect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence. [Citations.]'" (*Stanhope* v. *Los Angeles Coll. of Chiropractic*, 54 Cal.App.2d 141, 146 [128 P.2d 705].)

An examination of the evidence in our case shows that there is substantial evidence in plaintiff's favor to meet this test.

The trial court held both defendant and Peden liable to plaintiff. Defendant contends that there can only be a joint liability where the promisors are joint venturers or partners. The cases cited for this proposition do not support it. *Norris* v. *Campbell Electric Corp.*, 54 Cal.App. 72 [201 P. 132], held that there was no contractual relationship between plaintiff and two of the three defendants held liable by the trial court. In *Tryon* v. *Clinch*, 32 Cal.App. 150 [162 P. 428], the court held that there was no evidence to support a finding that the appellant had given anyone authority to bind him for the full cost of the improvement of a street. In *McEwen* v. *Taylor*, 106 Cal.App.2d 25 [234 P.2d 754], the reviewing court sent the case back to the trial court for further determination of the question of whether there was a joint liability. ■ In our case the evidence supports the conclusion that Heikes was an agent for both Peden and defendant and therefore they were jointly and severally liable. Section 1659 of the Civil Code provides: "Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several." We know of no authority to the effect that in order to hold two persons joining together in a promise they must be strictly speaking joint venturers or partners.

## 2. Rulings

### (1) *Rejection of Contract.*

Defendant sought to introduce the agreement between Peden and defendant under the terms of which Peden was to produce and pay for the directory, on the theory of the improbability of Baymiller's ordering the work of printing in view of the fact that Peden was to pay for it, and to show the circumstances surrounding the transaction. ■ Assuming that the contract should have been admitted, its rejection would be error without prejudice for the reason that

its principal terms were already in evidence. Baymiller testified at some length to the terms of the contract.

The evidence, in addition to showing a holding out by defendant to plaintiff of Heikes as its agent, brings the case within the rule "Where one performs for another, with the other's knowledge, a useful service of a character usually charged for, and the latter expresses no dissent, or avails himself of the service, a promise to pay the reasonable value of the services is implied." (*Young* v. *Bruere,* 78 Cal.App. 127, 132 [248 P. 301]; see, also, *Medina* v. *Van Camp Sea Food Co.,* 75 Cal.App.2d 551 [171 P.2d 445]; *Resetar* v. *Leonardi,* 61 Cal.App. 765 [216 P. 71].)

(2) *Admission of Evidence.*

(a) Plaintiff's exhibit 4 is a billhead or invoice with, among other matters, blanks for name and address of the directory advertiser "For insertion of your card in Directory as per your order—$15.00." These invoices were one of the items which Heikes ordered plaintiff to print after the original order for printing the directory was given. All checks by advertisers were made to KDON or KDON Directory and some were mailed to KDON long before plaintiff completed the work on the directory. It is a reasonable inference that these invoices accompanied the checks and thereby defendant was put on notice of their use. No objections to their use was made by defendant. The invoices, therefore, were admissible to show the holding out by KDON of Heikes as its agent.

(b) Plaintiff's exhibit 5 is a statement headed "Radio Station KDON" and its address. This was a form of statement the upper part of which was detachable and to be returned with the check in payment of the charge contained in the lower portion. This particular statement was addressed to Pacific Grove Tribune, plaintiff's newspaper, and contained a charge against it for $15 for "One Listing in the 1950 Directory and Guide Book and Announcements over KDON and KSNI, $15.00." This statement is in the same category as (a) above discussed. Moreover, this was a direct charge against plaintiff by KDON.

(c) Plaintiff's exhibit 6 is a copy of the Pacific Grove Tribune containing an advertisement "KDON, KSNI Compile Directory for County." This stated that such a directory was being compiled and prepared by these stations. While the evidence fails to disclose who ordered it, Baymiller admitted that a similar advertisement was run in the

Salinas Californian, defendant's own publication. Of this he had knowledge, although he denied knowing of the advertisements in the Tribune and other county papers. These advertisements were run long before any of the work was done by plaintiff. It is doubtful if Baymiller, a newspaper man, and the other executives of defendant, would not know that advertisements of this type were being printed in the county's newspapers. No repudiation of them was ever made. These are circumstances bearing on the question of ostensible authority. Hence the advertisement was admissible.

■ (d) Plaintiff's exhibit 1 is the KDON 1950-1951 Directory and Guide Book. An examination of it gives the very definite impression that it is published by KDON. Peden is nowhere mentioned in it. Defendant had notice of its contents when the first 600 were complete (10 per cent of the order). It in nowise repudiated the very definite holding out that it was the publisher of the book. It was admissible as another chain in the circumstances justifying plaintiff in the belief that Heikes was KDON's agent.

. The above-mentioned evidence which was admitted over defendant's objections was properly admitted as circumstances tending to bring the case within the rule set forth in *Wainwright Trust Co.* v. *Kinder,* 68 Ind.App. 88 [120 N.E. 419], and quoted with approval in *Moore* v. *Spremo,* 72 Cal.App.2d 324, 331, 332 [164 P.2d 540] : " ' " "The intention to pay and the expectation of compensation may be inferred from conduct where equity and justice require compensation, as well as from direct communications between the parties . . . To warrant the finding of such contract, the elements of intention to pay on the one hand, and expectation of compensation on the other, must be found to exist, but such elements, like other ultimate facts, may be inferred from the relation and situation of the parties, the nature and character of the services rendered, and any other facts or circumstances which may reasonable be said to throw any light upon the question at issue" ' ' "

### 3. REFUSAL TO REOPEN CASE

■ The trial was started February 14, 1951. It ended and the case was submitted for decision February 21. March 7, defendant filed a "Notice of Motion to Reopen Cause and for Commission to Take Deposition." The trial court denied the motion and thereafter rendered judgment. Defendant contends that the trial court abused its discretion in denying this motion. It is well settled that permitting or deny-

ing a party the right to reopen a case for the purpose of introducing further proof, and particularly after the trial has concluded even though before judgment, is a matter within the discretion of the trial court and will not be disturbed on appeal unless there has been a clear abuse of discretion. (See *Weber* v. *Marine Cooks' & Stewards' Assn.,* 93 Cal.App.2d 327 [208 P.2d 1009], and *Gelberg* v. *Consolo,* 51 Cal.App.2d 516 [125 P.2d 74].) Defendant wanted the submission set aside to enable it to take the deposition of Heikes in Pennsylvania and use it on a further hearing. The ground of the motion was that the whereabouts of Heikes was not known and could not with reasonable diligence have been known, prior to the trial. Accompanying the notice of motion was the affidavit to the effect that Heikes had now been found in Harrisburg, Pennsylvania; that he would testify that he had ordered the printing of the directory from plaintiff, telling him he represented Peden who was having the printing done and would pay for it; that in September, 1950, plaintiff told Heikes that plaintiff knew that KDON was not responsible for the bill but that plaintiff was going to try to collect it from somebody; that they were unable to discover Heikes' whereabouts prior to trial; that on February 16* after the first day's trial, Baymiller inquired of the Salinas manager of the telephone company as to Heikes' last known telephone number and was informed that it was located in Santa Barbara and that certain phone calls from said number were unpaid for several months, among which calls was one to a number in Harrisburg; that Baymiller then placed calls to all of said numbers and upon calling the Harrisburg number found that it was that of Heikes' brother-in-law and that Heikes was there at the time and talked to Baymiller; that Heikes said he was unwilling to come to California but would give his deposition in Harrisburg. An affidavit was filed by one of plaintiff's attorneys to the effect that plaintiff was en route to the Caribbean; that plaintiff had advised affiant that at no time did he state that he would look solely to anyone but KDON for payment of his bill.

There is no question but that the testimony of Heikes would have been material and important. Nevertheless, we cannot say that the court abused its discretion in refusing to reopen the case to obtain his deposition. There was no showing of diligence by defendant in attempting to locate

---

*Both parties state the trial commenced February 16. The transcript gives February 14 as the starting date.

Heikes prior to the trial. The affidavits merely state that his whereabouts was unknown to Peden, defendant and its attorneys, from whom alone inquiry appears to have been made. There is no showing of any diligent attempt before trial to locate Heikes. "It is not an abuse of discretion to refuse to set aside a submission for the taking of further testimony unless a good excuse is offered for the failure to produce the testimony before submission." (*Kan* v. *Tsang*, 90 Cal.App.2d 538, 542 [203 P.2d 86].) There is no showing why Baymiller could not have made the same inquiry of the telephone company prior to the trial that he made during the trial. But even more important is the fact that prior to the end of the trial defendant and its attorneys had contacted Heikes, knew what he was willing to testify, and where he was, but did not call that fact to the attention of the court or ask for a continuance to obtain his deposition, until after the trial was concluded and plaintiff had gone to the Caribbean. This was a lack of diligence which justified the court in denying the motion filed two weeks after the submission of the case. While the record does not disclose whether the judge had intimated what his decision would be, it is significant that defendant having all the information concerning Heikes that it later set up in its motion to reopen, permitted the case to be submitted without giving the judge that information. (See *Engstrom* v. *Auburn Auto. Sales Corp.*, 11 Cal.2d 64 [77 P.2d 1059], where the motion to reopen was not made until after the court had indicated its probable ruling on a motion for a directed verdict.)

*Winkler* v. *Winkler*, 54 Cal.App.2d 398 [129 P.2d 43], cited by defendant, where the reviewing court held that the trial court erred in not granting a continuance of the case for the testimony of the child of the parties, or, at least, a new trial upon the showing made by the *"undenied* affidavits" (p. 404), is readily distinguishable from our case. There were "peculiar circumstances here existing" (p. 404) which do not appear in our case.

#### 4. BOOK ACCOUNT

Defendant's contention that there is no evidence to support the finding that defendant became indebted to plaintiff on an open book account is based primarily upon its claim that there is no evidence to support the court's finding that the work was ordered by KDON. We have here-

tofore pointed out that there is such evidence. Hence its contention falls. ■ Defendant contends that the fact that the signature "KDON Special Directory Account" on the check for $550 in part payment of the account was in typewriting, in some way was notice that the check was not sent in payment of a KDON obligation. This is a nonsequitur. Any reasonable person on seeing the check so signed would conclude that it was a payment of a KDON obligation. He would reasonably assume that the special directory account was simply a matter of intraoffice bookkeeping. The court's finding in favor of defendant on the account stated count is not necessarily a finding that defendant did not receive the bills sent it by plaintiff.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.